Good morning, Your Honor. Lawyers are good people, too. Oh, yeah. Yeah. My name is Lanny Davis. May it please the Court. I finally convinced my grandson to go to law school. May it please the Court. My name is Lanny Davis. It was his. Well, I asked him once when he was a little boy. I said, what do you want to be when you grow up? He said, I want to play for the NBA. I said, well, you know, it's not so easy. What if that doesn't work? Well, I want to play for UCLA. Well, you know, that might not happen. What if that doesn't work? Well, I'd like to be an architect because I like lines and forms. I said, what if that doesn't happen? He said, Grandpa, if I can't be what I want to be, I guess I'll have to become a lawyer like you and my wife. Your Honor, I begged my oldest son to become a lawyer, and he decided to be a journalist to take it out on his father. So that's what he enjoys doing. In the long run, that may be a good thing. We represent two separate plaintiffs in this case, Vivendi and VH1, standing in the shoes of the General Motors Corporation. The court below abused its discretion in three material ways by relying on an erroneous view of the law and a clearly erroneous assessment of the evidence as the Ninth Circuit held in the Rosa case, in which Judge Pragerson, you joined. First, in the evaluating of the seven private interest factors, the court failed to apply the latest modern telecommunications technologies as they have been commonly allowed in this circuit and under the federal rules for many years. For example, the court ignored the availability of rapid and inexpensive scanning of electronic transmission of documents, the availability of live teleconferencing of the testimony of remote witnesses subject to real-time cross-examination and the ability to judge credibility. Therefore, it erroneously found that the private interest factors favored defendant. When taking these modern technology capabilities into account, it should have found, at the very least, that five out of seven of the private interest factors were neutral and the other two were at least neutral or favorable to the plaintiffs. Second, in evaluating the five public interest factors, the court erroneously failed to assume as true, as the law requires, the unrebutted factual allegations in the complaint, specifically naming the CEO, the COO, and a board member of T-Mobile Seattle, Washington, the headquarters of T-Mobile United States, as, quote, active participants in the RICO conspiracy. Paragraph 24. Mr. Davis. Sir. Let's go back a little bit to some of the concepts that you've mentioned.  is that the trial court failed to get with it as far as the internet and electronic advancements have been made and take advantage of and consider what can be done as far as having a trial in Seattle as easily as in Atlanta or in Keokuk-i or any place else, right? And I follow that. My question specifically to you is, is that a determination of fact as to which an abuse of discretion standards scope of review should be applied or is it a determination of law as to which we review de novo? It's a determination of fact and law, Your Honor. It's a determination of fact that the law is the requirement. Whether you have time screening or not. The law is the requirement that in dismissing a form nonconvenience case, the defendants bear the burden of proving that the private interest factors strongly favor them when the court fails to utterly address the issue of technology as making it easy to transmit documents and live testimony in a case involving four or five countries. How do you know that the court utterly failed to take any of these matters into consideration? The only reference to technology in the entire decision, from reading the decision is the answer is how I know, is a incorrect reference to one piece of technology, namely whether you can transmit documents through scanning and electronic transfer. The court addressed that singular issue and said it's, quote, easier to go to a remote location to review documents than it is to scan them and post them on the Internet. So that one address of technology is the only time he mentioned it. He never mentioned once Rule 34, which allows for videotape testimony, nor did he mention Rule 43A, which has been used over and over again, especially in recent years, to allow live testimony to be transmitted from a remote location. So he omitted referring to either one of those possibilities. And so as a matter of fact, he was wrong in balancing the private interest factors. He was wrong as a matter of law in not holding the defendants to the burden of proof. But I take your point as far as him not mentioning several scientific availabilities. As to whether he made the wrong decision as a factual question, it's not a question of whether he was right or wrong, but whether he abused his discretion, correct? Yes, and we would say that under the standard in the Rosa case, if the district court clearly erroneously assesses the evidence, that is a standard in the Rosa case that would be an abuse of discretion. When he says that it's easier to go to a remote location and review documents in person rather than scanning them and sending them electronically, that is a matter of erroneous interpretation of fact, and it also does not hold the defendants to the standard of the burden. I take it you would take the U.S. Gibson case where we have an abiding indefinite conviction that a mistake was made as to the assessment of the evidence as being the scope of review that we should have in this case. Clearly erroneous is your standard for abuse of discretion. It's a tough standard. We're not asking this court to substitute its judgment for the district court judgment, except in this rare instance where the judge says it's easier, he used the word easier, to go to a remote location than to scan. It's very interesting and fairly abstract. I wish you could go to the heart of it. The way the case looks, a large foreign corporation that says it was defrauded in Poland is suddenly turning up in Seattle as the place where it should redress its wrongs. And what on earth about the defendant here connects it with the fraud in Poland? Well, I was about to refer to the specific connections to Seattle, so let me answer your question. No, but go to the heart of it. The heart of it is that three executives in T-Mobile Seattle, the CEO, the COO, and a member of its board, participated in... What did they do? They went to Germany and participated as members of the board of directors of T-Mobile International, located in Germany, at the time that T-Mobile International physically and brutally took over a company that my client Vivendi had... I'm sure they didn't physically take over the company. What facts do you allege they did? We allege specifically that these three people were both executives of Seattle, T-Mobile, and on the board of T-Mobile International Germany when T-Mobile International Germany took over the Polish telephone company. And, Your Honor, if they disagree, they had an opportunity to put in rebuttal declarations. They did not, and this is a case of the dog that did not bark. We also allege that by their own reckoning, T-Mobile Seattle is the economic driver and it's one company in a global seamless wireless network. The fact that these executives did not put in a declaration denying specific allegation that they participated actively in this conspiracy. They could have put in a rebuttal. They did not. This is a case of the dog that did not bark. Another answer to your question is that VH1, standing in the shoes of a U.S. corporation, had its own independent allegations about how these three individuals and how T-Mobile Seattle participated in a bankruptcy fraud with the other defendants to deprive General Motors of its rights to bonds. That's a separate claim. The district court below did not give any attention to the separate claim of VH1 and General Motors. Indeed, he challenged the motives for VH1 purchasing the bonds from General Motors when just last week in a case that we noticed to this court, that investment paid off greatly with a judgment of over $200 million, proving that the investment into those General Motors bonds was valid. But more importantly, General Motors is a U.S. corporation. Never to my knowledge has this panel or any panel in the United States on foreign nonconvenience grounds dismissed a U.S. corporation, in this case General Motors, suing a U.S. corporation, in this case Seattle T-Mobile, about a U.S. statute with U.S. fraud under RICO and U.S. conduct and effects. All of that as to VH1 and General Motors was utterly ignored. This court below only evaluated 10 out of the 12 public interest factors regarding the VH1 and General Motors case. It literally ignored that case. GM is not a party in this case. VH1 stands in the shoes of GM. It's the assignee. Correct. VH1 Vivendi Holding is an assignee of General Motors and owned by Vivendi S.A., right? Yes. GM is not a party in this case. So this isn't a case where a domestic corporation is being denied a place to sue. Well, actually, sir, we stand in the shoes identical to General Motors as if it were a party. Your statement that GM is a domestic corporation being denied a right to sue in Seattle is a little bit incomplete. It's to complete the sentence, Your Honor. VH1, standing in the shoes of all of the rights of a U.S. corporation named General Motors, is being denied. VH1? VH1 is owned by Vivendi. Pardon? But the purchase by the French corporation? Correct. But the purchase by VH1 of those rights to stand in the shoes of a U.S. corporation was challenged by the court below as a manufactured claim in order to get to Seattle. In fact, it was an investment in a financial position that last week was proven to be valid because it was the beneficiary of a $200 million judgment. Supplemental excerpts of Record 245, Vivendi holding, Vivendi stated that Vivendi Holdings' acquisition of Everest Bonds was done in part to strengthen Vivendi's case for the purposes of forum nonconvenience. Certainly there were. I mean, yeah, you bought a claim in order to sort of make it a little heavier that you had some American claims. We say there were two purposes, Your Honor. But the second purpose was given such short shrift by the judge that he never went through any evaluation of the public and private interest factors. He called it a manufactured case. At paragraphs 101 to 128. That's a factual determination, right? No. It's a failure to address and even give us our day in court. He never addressed the private and public interest factors. He never addressed paragraphs 101 to 128 where V.H.1, standing in the shoes of General Motors, alleges factually that was never rebutted by any declaration in this case that the defendants deprived General Motors, V.H.1 standing in its shoes, of bonds through a bankruptcy fraud. The court ignored those allegations, standing unrebutted, and then completely ignored the requirement to analyze public and private interest factors. All we're asking for is our day in court. And as to V.H.1 General Motors, the second plaintiff in this case, and there are two, we would at least like. How does this hurt General Motors? General Motors had the right to equity beyond its return on bonds. And General Motors had that right and was deprived of that right through a bankruptcy fraud that we allege that stands unrebutted, occurred as a result of fraud in a bankruptcy court in Poland. And those allegations stand un- Not in Seattle. In Poland, but it's a General Motors claim that we stepped into and purchased. And the purchase was an investment decision that turned out to be quite valid, as demonstrated by the $200 million judgment last week. If you're successful, what does General Motors get? Well, we purchased the bond position. Let me just ask you, what do they get? Nothing. V.H.1 gets a return on its investment, which, by the way, Judge Pragerson, is contrary to the holding of the judge below, which is why we say it was abusive discretion to say it was a manufactured case. If it's manufactured, the judge never addressed our allegations of how the fraud occurred in paragraphs 101 to 128, and then it never addressed any of the public and private interest factors other than two in passing reference. That's 10 out of 12, which is to say, as to V.H.1 and General Motors, we never got our day in court. Better save some time. Yes, I wanted to reserve five minutes of time, so thank you. You've got one minute left. One minute. One minute? Reserve the one minute. And four seconds. May it please the Court, my name is John Pierce on behalf of the Doji Telecom Defendants. I have conferred with Mr. Souter, who is the counsel for Mr. Solorz, and I will take the bulk of the time, but may leave some time at the end of my 15 minutes for him to speak as well. As the District Court correctly recognized, Your Honors, this dispute among Polish, French, and German competitors in the Polish telecommunications business over a Polish telecommunications company does not belong in a U.S. court. The District Court clearly considered all of the relevant public and private interest factors and came to the reasonable conclusion that the balance of conveniences clearly suggests the trial in this form would be unnecessarily burdensome for the defendants. What do you say to Mr. Davis's point that the trial judge made no mention of the severe technological advantages that there are that maybe did not exist some years back, and as to which some judges may not have caught up, that make the trial in Seattle every bit as convenient through the miracles of the Internet and web postings as it would be to have a trial in France or Germany or Poland? I would say a number of things. First, I would say that that doesn't clearly reflect what the District Court said. If the panel looks at footnote 4 of the District Court's opinion and the paragraph that precedes it, although the Court recognizes that technology for electronic review and transmission of documents has progressed mightily over the past several years, this technology does not come without cost. It goes on to explain that it makes no sense to engage in this process if the documents can be reviewed more easily in a location that would not necessitate scanning each document, Poland, for example. And then there's a footnote where it says, the Court recognizes that regardless of where the case is held, the parties may choose to have the documents scanned, as scanned documents are easier to work with and depending on the way they are scanned can be searched using keywords and phrases. He understood very well how modern litigation works. He understood very well that documents can be scanned, and he gave this private interest factor slight consideration. He said it slightly favors this form because he fully recognized that in this modern age, this isn't 1947 when Gulf oil was decided, when documents had to be brought, this is 2009 when documents can be scanned. He fully recognized that. I would say that. I would say that with respect to this notion of having witnesses testify through some sort of electronic means, that's not a favored form of testimony. The Ninth Circuit has said, as other sister circuits have said, live witness testimony, particularly in a case where fraud is alleged, to assess demeanor, is very important. There's no reason to assess the kind of cost that would be required to get every relevant witness on some sort of electronic feed when many of the relevant witnesses are in Poland. Well, I'd like you to deal with the part of his claim that you ran the scheme in Poland. Your men were in charge. He says that's his allegation. How do you respond to that? First of all, Your Honor, I would say there are a number of defendants here. There are the German DT defendants. I know, but he says your T-Mobile people are the people that really ran things. I would respond to that in a number of ways. I would say, first, look at the complaint. You'll notice in their papers they never quote their complaint, but if you look at paragraph 24 of their complaint, which is where they lay out what T-Mobile's officers supposedly did, there's not a single factual allegation anywhere in there that they did anything connected to this fraud. They say Mr. Dotson, who's the president and chief executive officer of T-Mobile USA, is on the management board of T-Mobile International. That's what they say. There's no allegation that he was off in Poland involved in some sort of a fraud. In their initial disclosures, they list Mr. Dotson, and they say he may have some information related to the relationship between T-Mobile USA. Pierce, do you espouse the rule of Bell Labs versus Twombly as the rule we have to follow rather than Conley versus Gibson? I think that is the rule. I don't think these allegations would sustain a motion to dismiss. These are conclusory. At the very most, there's a conclusory allegation that someone in T-Mobile USA was involved. When you look at the factual allegations, there's not one that suggests that anyone was involved. And that's not all. It's not just the complaint. The district court was sensitive to this issue. The only real connection between this dispute is that he hasn't said that the T-Mobile CEO, COO, and member of the board voted to take over Polska. He hasn't said that. He hasn't said anything that would suggest they had anything to do with PTC. He just said they acted on the board, which did take over Polska. He said that Mr. Dotson, who is the CEO, is on the board of management of this entity, T-Mobile International. And then they say T-Mobile... He certainly said orally in his brief that your company ran it. Now, does he say that in the complaint? No, sir. No, Your Honor. And the district judge was very attuned to this and specifically granted foreign non-convenience discovery to look at this very issue to see what is the local interest here. Was T-Mobile USA involved? That discovery showed nothing. Vivendi admits that. And then after getting that discovery, Vivendi stood up at the motion to dismiss and said, We need more discovery. We need broader discovery to see if T-Mobile USA had anything to do with this. They have absolutely no evidence to suggest that T-Mobile USA had anything to do with it. And I would point out, as the district court did in his opinion, this is a dispute that's been waged since 1999. There have been countless arbitrations and litigations in Europe surrounding these facts. Never once has T-Mobile USA come up as a defendant or been implicated in any way until this suit was brought. We also did submit two declarations, I would add, that one from a senior person at DT who's also on the supervisory board of PTC and from the chief financial officer of T-Mobile USA who said T-Mobile USA had nothing to do with this. So there was ample evidence in the record for the district court to conclude that there was no bona fide connection between Seattle and this dispute. What about the GM bonds? I would say this about the GM bonds. It is undisputed that at least one of the reasons Vivendi engineered this acquisition for Vivendi holding its U.S. subsidiary to acquire these bonds from GM was to increase the connection between this dispute and the United States. Now, they say now, well, there are all these business reasons. But at the time, when they were responding to our challenge to the Third Amendment complaint where we said, Your Honor, they're just manufacturing a basis to litigate here, they said, no, we have legitimate reasons. One of them is to strengthen the U.S. connection. One of them is to get evidence. And one of them is to be able to assert claims against Mr. Solorz for what they claim to be stripping of assets at Electrum, a Polish company. They never mention any business reason at that time. This is clearly a litigation strategy. And courts do not award deference to a company that acquires a claim in order to sue in the U.S. There's an important footnote in the Irigori case in the Second Circuit where it lays out, and this is a case that the district court relied on, where it lays out the deference analysis and how courts ought to approach these form of nonconvenience questions. And it says, of course, in footnote three, if a plaintiff were to acquire U.S. residents for purposes of being able to sue here, it wouldn't get the same deference. That should be clear. They say we have a very good business reason, as proved by $200 million. They say now that a decision has been rendered that will permit the bondholders to potentially recover money. That's what they say. That is not what they said at the time. That's why they did it. They expressly admit that they did it to increase their connections to the United States. The fact that now they're going to get relief in Poland only indicates that that's where that claim belongs. This isn't a Polish bankruptcy proceeding. It's nothing to do with the United States, that claim. That's where that judgment came. Correct, Your Honor. Correct. Now, in terms of the state... Where are they going to collect the $200 million? Well, they're a bondholder. They're a bondholder. And the bondholder's claims are being litigated in England, Your Honor. Where? In England, in the High Court of England. That's where that decision came down, was from. I thought you said in Poland. Well, it relates to a Polish bankruptcy proceeding, but the proceedings themselves are in England. All right. Now, we are under a clear abuse of discretion standard. Vivendi makes a lot of points in its brief about how the district court here applied the wrong standard to the case. But it didn't. It used a standard that came directly from the Luke case. It came originally from Piper Aircraft and has been repeated by this court in Luke, in Lachman, in Contact Lumber. And it's a standard that says if the balance of conveniences suggests that trial in the chosen form would be unnecessarily burdensome, dismissal is proper. There was nothing wrong with applying that standard. In terms of the private and public interest factors, they weigh overwhelmingly in favor of trial in Poland. And I think the reason why there's this focus now on technology is because Vivendi has no answer to that. The vast majority of witnesses are either in Poland, Germany, or France. The parties are either in Poland, Germany, or France. The documents are there as well. But if you have a trial here in Seattle, they'll get a jury on the fraud counts, right? They may get a jury here. They won't get one in Poland. I know they won't get one in England. That's likely true. And they certainly won't get one in France. That's likely true, and that may be one of the reasons, that's one of the reasons, Your Honor, that the Supreme Court identified in Piper why foreign litigants might wish to come to the United States to litigate. They see advantages in our system. One of them is broader discovery. One of them is jury trials. One of them is punitive damages. But those are all tactical advantages. Rico. I beg your pardon, Your Honor. Rico. Rico. Well, Rico, the desire to come here to benefit from favorable law. Isn't that good for American lawyers' business? I cannot deny that, Your Honor. That's true. That's true. I will cede that point. But when they mention, Rico is a classic example. It's been identified in a number of cases where because of the trouble damages provision in Rico, foreign litigants come to the U.S. and seek to benefit from it. That's exactly what Vivendi's done here. In each of the four iterations of their complaint, they seek trouble damages under Rico. They admit that one of the reasons they came here was for Rico. And to take advantage of favorable law is a classic forum shopping reason that's been identified by the courts. Now, why is it forum shopping? I mean, what's wrong with forum shopping? Well, the whole, as the Supreme Court said in Piper Aircraft, the central purpose of the forum nonconvenience inquiry is convenience. So the key to the question of deference is, as the Second Circuit put it in the irrigory, to what extent is the party coming here truly for reasons of convenience as opposed to reasons of simple forum shopping? That's the problem with coming here for forum shopping. It doesn't get to the point of the forum nonconvenience inquiry, which is where is the trial going to be most convenient. I think forum shopping can be another man's quest for justice. Yeah. That's just a phrase that's used. Yeah, it's forum shopping. Go away. Yeah, you want justice. Stay here. I might address in the private interest factors, there's an important point that I think has been overlooked, and Vivendi addressed it in his briefs. I don't think it's correct. And that is the issue of the fact that there are multiple proceedings already pending. This is not a dispute where this is one case. They've chosen to come here for what they say are reasons of convenience. There are a significant number of cases pending that Vivendi has brought in France, in Poland, in Switzerland, the current ICC arbitration pending. And this Court has said in the Loop case, in the Gemini Capital case, in the Contact Lumber case, that is a factor, the pendency of such related proceedings, that militates strongly in favor of dismissal. And with that, I see I have two minutes and 28 seconds remaining. I will see the rest of my time, unless the panel has further questions, to Mr. Souter. Good morning. Ben Souter on behalf of Mr. Solars. I note with interest that during Mr. Davis's presentation, my client's name was not brought up in terms of anybody who did anything in connection with this proceeding here. We have Mr. Solars with uncontested evidence before this panel, before the District Court, in the form of a declaration, along with the declarations of two other Polish lawyers, that he has absolutely zero connection with this State, absolutely zero business ties to the United States, and there is not a single allegation in the underlying complaint that ties Mr. Solars personally to the RICO allegations that are set forth in the complaint. The difficulty for the claimants, for the plaintiffs, in my judgment, is that Mr. Solars has uncontested evidence before the Court, demonstrating not only that he has no connection to the U.S., but that this would be incredibly burdensome, vexatious, and oppressive for him to have to come to the United States to defend this matter. He does not speak English. He's never done business in the United States.  The only allegations in the complaint relate to a couple of cell phone calls and a couple of emails that were sent by lawyers working for Electrum, not lawyers for Mr. Solars. That evidence is uncontested. The plaintiffs here never sought to obtain any evidence from Mr. Solars. They never sought to challenge the evidence, and it's patently clear that Mr. Solars is at most an afterthought here, and he is the chairman of the supervisory board of Electrum, and perhaps there are some reasons that they named him that haven't gotten put into the papers. But as far as – Has a deposition been taken? No, sir. There has been no deposition taken, but there have been three affidavits that have been submitted, and they're uncontested, demonstrating absolutely no connection to the United States. Mr. Solars has been on vacation in the U.S. in his lifetime less than six times. He has never conducted any business, and there's no allegation in the complaint tying him to these allegations. The proceedings are in Europe. There are 30 or 40, and I have to say when I hear that Electrum is liable for $200 million, that's just one step along this process, and this process is winding its way through in numerous countries, in the LCIA, the London Court of International Arbitration, and other forums, and there are lower court proceedings. There are court of appeal proceedings. Sometimes those reverse the lower court proceedings. But at the end of the day, whatever justice they are seeking is being sought in Europe. They've acknowledged that Poland is an adequate forum, and no question about that. In fact, in their reply brief, they specifically stated, consistent with the argument of the district court, that they're not saying that they cannot receive justice in Poland. Poland is the place where my client lives, where he works. It's the language that he speaks in. It's where his documents are located, and if they have a beef with Mr. Solars, they ought to pursue that in Poland, where he lives. He can't be brought into this court, in our judgment, simply by virtue of some lawyers having talked on cell phones or created e-mails and then saying, Mr. Solars, you belong in Seattle. I'd be happy to respond to any questions that the panel may have. No questions. Thank you very much. I guess I have one minute. Yeah, go ahead. In one minute, let me remind the court that- We'll give you two, because counsel went over a minute. Thank you. Forum nonconvenience is a weapon to be used sparingly, as the Ninth Circuit said in Rosa and in many other cases, only when the defendants bear the burden of proof of showing that litigating in Seattle is more oppressive and vexatious compared to the convenience of plaintiffs. The court, all three of you, have asked, what are we doing in Seattle if this is all about Europe? We have unrebutted allegations that could have been rebutted, that the three top executives in Seattle sat on the German company board that brutally and physically took over a Polish company, and we lost $2.5 billion. They did not rebut those allegations. Read paragraph 24, and you'll see that we don't allege conclusory allegations. We allege facts that lead to unavoidable inferences. If you sit on a board at the very time that racketeering conduct is occurring, that's an inference that we're allowed to plead. We do not have to plead our case and win our case in a pleading. We did plead facts that lead to an inference. They were on the board when it occurred, and they live here in Seattle. And the burden of proof is on defendants, not on us, to prove oppression and vexatiousness, which is my final point, Judge Bea, on the issue of telecommunications capabilities. In fact, my colleague and my friend actually misquoted from the judge's decision. If you read page 21 and 22 of the judge's decision, he ends up saying that that factor of access to documents favors the defendants, that they met their burden of proof, even though he says that the documents can be reviewed more easily in a location that would not necessitate scanning each document. And we say that if you take into account today's modern scanning technology, that is a simply egregious abuse of discretion because it's a false statement. We also say he never referenced live testimony. My colleague said that there's something wrong with live testimony teleconferenced into a trial. That has consistently been allowed under Rule 43A, and my colleague says that there's something wrong with that. There is nothing burdensome about defendants using that method if they don't want to fly to Seattle. Mr. Davis. Yes, sir. Let's take the possibility that the documents, if they were reviewed in a location where they were located, in other words, the original documents, and if there was some question about the authenticity of the documents, the integrity of the documents, whether these are really the documents, et cetera, wouldn't that be more easily determined, especially by expert witnesses examining the documents, by looking at the originals rather than scanned versions of them? If there was a question about authenticity, yes, Your Honor, but the burden is on the defendants to show oppression and vexation. The documents they gave us in our discovery was on disk. Everybody is using scanning technology and transmitting documents. If there is a question of authenticity, that can be raised in scanned documents when you look at them. It hasn't been raised so far. It has not been raised so far, but the question is, have they met their burden of showing oppression and vexation? That's why this Court and this Circuit have consistently said, use this motion for foreign nonconvenience sparingly. You can down the road get a case dismissed on other grounds, but don't use foreign nonconvenience unless the defendant meets the burden, and I would say if you read the Court's decision, you would say, wait a minute, what burden is there on scanning documents and posting them on the Internet? What burden is there if you don't want to fly to Seattle on a corporate jet that most of these billionaire companies have? What burden is there on doing live testimony when that's been allowed under Rule 43A, which was enacted in 1996? We have live teleconferencing where you can cross-examine. The jury gets to read. Credibility, I could give you a number of citations where the courts today are saying live testimony is permissible. The question I close with is we're looking for justice. We invested at Vivendi $2.5 billion and have zero, and the company was taken away by brutal force, and the T-Mobile Seattle executive sat on the board at the time that was done. There's an inference that they knew about it. Secondly, VH1 is a genuine plaintiff. We deserve our day in court. At the very least, remand and ask the judge below to address our case as if we're real people suffering a real harm, a real U.S. harm, which did occur in a bankruptcy fraud that deprived General Motors, the position we stand in, of its ability to collect on those bonds, and when we were doubted as a manufactured case made up just to be here, and that was one of the reasons, but we said two reasons. One was to hedge the investment. The other was a tactical reason to be here. We ended up vindicating our judgment by winning a $200 million damage judgment contradicting the notion of a manufactured case. We only ask for justice, and we only ask that this court apply the burden of proof where it belongs, not on the plaintiff to prove that Seattle is more convenient than Poland, on the defendants to prove that Seattle is vexatious in oppression under the private interest factors, and if we have unrebutted allegations of racketeering conduct with harmful effects here in the United States with people in Seattle, which we say specifically in paragraph 24 were, quote, active decision makers and participants in Defendants RICO Act violations. That's an allegation of fact asserted by the inference that they served on the board in Germany at exactly the time that racketeering takeover occurred. That's a reasonable inference. It's a fact leading to a reasonable inference. It's not a sheer possibility. It's a reasonable inference that supports paragraph 24. It's not up to us to prove that we are more convenient. It's up to the defendant under a tool used sparingly in this circuit. It's up to the defendant to prove oppression and vexation to get a foreign nonconvenience dismissal at this juncture of the case. Thank you very much for the extra time, sir. Thank you very much, and the matter will stand submitted. The case was very well argued on both sides. We appreciate that very much.
judges: Pregerson, Noonan, Bea